UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Cause No. 1:19-CR-2-HAB |
| ) | |
| CALVIN JONES ) | |

**OPINION AND ORDER**

Defendant Calvin Jones ("Jones") pleaded guilty to possession with intent to distribute a synthetic cannabinoid as well as aiding and abetting his co-Defendant, Diamond Parker ("Parker"), to commit the same crime. Jones' plea related to a scheme to send drug-soaked paper into prisons under the guise of legal mail.

Now before the Court are several objections filed by Jones to the presentence investigation report ("PSR"). An evidentiary hearing on the objections was held in March 2023. The objections are now fully briefed (ECF Nos. 209, 213) and ready for ruling.

**I.      Factual Background**

This case involves more than a dozen different mailings to inmates from August 2017 through November 2018. Jones admitted mailing two packages in January 2018. Parker admitted sending a third package in December 2017. The remaining packages were sent by uncharged or unknown individuals. Some packages were tested for drugs while others were not. The Court will discuss the packages in detail as required below.

Officers executed a search warrant at a residence on Fourth Street in Fort Wayne, Indiana, in November 2018. The search uncovered evidence of the mailing scheme, including digital scales, pre-printed labels addressed to inmates at prisons throughout Indiana, a drug ledger, latex gloves, and a spray bottle containing the same synthetic cannabinoid found on some of the mailed

packages. Officers also found Jones' driver's license and, in a connecting room, a handgun and ammunition.

## II. Legal Discussion

### A. *Drug Weight Calculation*

The parties did not agree to a drug weight calculation in the plea agreement. Relying on the total weight of all mailings, and statements of individuals who had dealings with Jones, the PSR calculated the total drug weight as 1,605.353 grams of synthetic cannabinoid. The Government agrees with this calculation, but Jones does not. There are many disputed issues about the calculation, and the Court will address each in turn.

### 1. *Weight of the Carrier Medium*

Jones first argues that the Court should disregard, or at least minimize, the weight of the paper used to absorb the synthetic cannabinoid when calculating drug weight. He relies on a note to the drug quantity table in U.S.S.G. § 2D1.1, stating, "In the case of LSD on a carrier medium (e.g., a sheet of blotter paper), do not use the weight of the LSD/carrier medium. Instead, treat each dose of LSD on the carrier medium as equal to 0.4 milligrams of LSD for the purposes of the Drug Quantity Table." U.S.S.G. § 2D1.1(c)(G). Since this case also involved drugs soaked into paper, Jones argues that the same logic should apply.

The Court concedes that Jones' analogy is a good one, but the Guidelines already tell the Court how to deal with synthetic cannabinoids. Application Note 27(E)(1)(i) states:

> **Departure Based on Concentration of Synthetic Cannabinoids.**--Synthetic cannabinoids are manufactured as powder or crystalline substances. The concentrated substance is then usually sprayed on or soaked into a plant or other base material, and trafficked as part of a mixture. Nonetheless, there may be cases in which the substance involved in the offense is a synthetic cannabinoid not combined with any other substance. In such a case, an upward departure would be warranted.

2

> There also may be cases in which the substance involved in the offense is a mixture containing a synthetic cannabinoid diluted with an unusually high quantity of base material. In such a case, a downward departure may be warranted.

U.S.S.G. § 2D1.1 cmt. n. 27(E)(1)(i). The Commission's directions are clear: the Court is to consider the entire weight of the mixture when calculating the guideline range but can depart up or down at sentencing based on concentration. That is what the Court will do. The weight of the drugs and the paper will be considered in calculating the total drug weight.

**2.**   *Weight of Untested Pages and Packages*

Jones next objects to including untested pages and packages in the total drug weight. As the Court sees it, this objection is two-fold. The PSR states that, for some packages, only sample pages were tested for drugs. Jones argues that only the weight of the tested pages should be used. For other packages, no testing was done. Jones argues that these packages should not be considered at all.

Jones first argument fails. While the Court can find no Seventh Circuit authority, other Circuits are uniform in concluding that district courts can extrapolate total drug weight from representative samples. *See United States v. McCutchen*, 992 F.2d 22 (3rd Cir. 1993); *United States v. Brett*, 872 F.2d 1365 (8th Cir. 1989). As the Third Circuit held, "If a defendant challenges a drug quantity estimate based on an extrapolation from a test sample, the government must show, and the court must find, that there is an adequate basis in fact for the extrapolation and that the quantity was determined in a manner consistent with accepted standards of reliability." *McCutchen*, 992 F.2d at 25-26.

The PSR shows that random samples were taken from several packages and Jones does not challenge the drug testing method. (*See, e.g.*, ECF No. 223 at 5, 6, 7, 9, 10, 12, 13). The Court finds that the testing, and the extrapolation from that testing to the rest of the sampled package, is

reliable enough for sentencing purposes. For those packages where testing was conducted, then, the Court will consider the weight of all pages in determining the total drug weight.

The second argument is a closer question. To determine drug weight, the district court may rely on information reflected in the presentence report if it is reliable. U.S.S.G. § 6A1.3(a); *United States v. Garrett*, 757 F.3d 560, 572 (7th Cir. 2014). When challenging information from the report, Jones bears the burden of proving unreliability. *United States v. Rollins*, 544 F.3d 820, 838 (7th Cir. 2008). Information that is only a "naked or unsupported charge" is unreliable. *United States v. Moreno–Padilla*, 602 F.3d 802, 808–09 (7th Cir. 2010).

A review of the PSR and the briefs shows three instances in which no chemical analysis was done on suspected drug packages.[1] The first is a package sent by Jones to Jamar Barnes in January 2018. (ECF No. 223 at 9-11). Like other packages that did test positive for drugs, this package had a fictitious return address for Allen County Department of Child Services. But that's all the Court knows about this package. The Government does not explain why no chemical analysis was performed.[2] The Government simply assumes that the Barnes package, like the others, contained drugs. A reasonable assumption, but not one based on any analysis of the Barnes package or facts specific to that package.[3] The Court does not find the drug weight assigned to the Barnes package to be reliable and will not use the Barnes package in determining the total drug weight.

---

[1] The Court also notes a reference in paragraph 76 of the PSR to a package mailed in April 2019 to Jamar Barnes that apparently sickened a correctional employee sorting the mail. The Court cannot correlate this paragraph to any other paragraph in the PSR. Because the Court has no information about this package, the drug amount in this package, 116.64 grams, will not be considered.

[2] The Court notes that the PSR later explains that "the net weight [of the drugs] was not determined due to the hazardous nature of the substance." (ECF No. 223 at 14). The Court has no reason to doubt this, but it notes that fingerprint analysis was conducted on the Barnes package. (*Id*. at 10). This is not a situation, then, where analysis could not be done because of danger to the tester.

[3] For instance, it is not unreasonable to believe that Jones sent test packages, with no drugs present, to test whether the packages made their way to the intended recipients. The Court has no proof that this occurred, but it also has no proof that the Barnes package contained drugs.

The other two instances are markedly different. In mid-September 2018, law enforcement intercepted jail calls in which Kanisha Russell admitted meeting with Jones four times, during which Jones provided her with 30 sheets of drug-laced paperwork. Similarly, in November 2018, investigators determined that Rosita York met with Jones and obtained ten pages of drug-laced paperwork. (ECF No. 223 at 16, 17). For these packages, the evidence shows that they contained drugs and that they came from Jones.

Jones claims that the statements of Russell and York should be disregarded as unreliable, relying on *United States v. Helding*, 948 F.3d 864 (7th Cir. 2020). There, the Seventh Circuit found that it was error for a district court to attribute drug weight to a defendant based on the statements of confidential informants when the PSR contains no evidence about the informant's reliability. *Id*. at 869-72. But this is not a case involving confidential informants. And even if it were, the PSR does provide some information that reflects positively on the credibility of Russell and York. Russell's statements were made on recorded jail calls, not to investigators. The Court sees no reason why Russell would falsely implicate herself in a federal crime when there was no benefit for doing so. As for York, investigators seized the pages she admitted obtaining from Jones. While those pages weren't tested, the presence of physical evidence corroborating York's statements is at least a "modicum of reliability." *Id*. at 871. The Court finds the statements of Russell and York to meet the low bar of reliability for sentencing and will consider their statements in determining the total drug weight.

**3.**     *What is Relevant Conduct*

Finally, Jones objects to the PSR assigning him all weight from similar conduct. Jones argues that, at least for some packages, there is no evidence linking him to the mailings. He wants the weight from those packages removed from the total drug weight.

Section 1B1.3 of the guidelines instructs district courts to compute sentences based on quantities of distributed drugs that were not accounted for in the actual conviction but that were "part of the same course of conduct or common scheme or plan" as the convicted offense. *United States v. Arroyo*, 406 F.3d 881, 888 (7th Cir. 2005) (quoting U.S.S.G. § 1B1.3(a)(2)). This "relevant conduct" rule allows district courts to consider additional quantities of drugs not specified in the conviction as long as "the unconvicted activities bore the necessary relation to the convicted offense." *United States v. Bacallao*, 149 F.3d 717, 719 (7th Cir. 1998) (internal quotation marks omitted). According to the guidelines, two or more offenses are part of a common scheme or plan if they are "substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purpose, or similar modus operandi." U.S.S.G. § 1B1.3 cmt. n. 9. Offenses that do not meet the requirements of a common scheme or plan may nonetheless qualify as part of the same course of conduct if they are "sufficiently connected or related to each other as to warrant the conclusion that they are part of a single episode, spree, or ongoing series of offenses." *Id*. When the Court relies solely on the PSR to make its relevant conduct finding, the PSR must explain how the earlier distribution activities were a part of the same course of conduct or common scheme as the offense of conviction. *United States v. Sumner*, 265 F.3d 532, 539–40 (7th Cir. 2001).

Let's start with the easy ones. Jones pleaded guilty to Count 4, which charged him with sending drug-laced packages to Jonathan Lynch and Michael Serna in January 2018. Those are in. Video surveillance showed Jones mailing another package to Jonathan Lynch later in January 2018. (ECF No. 223 at 10). That one is also in. And, as discussed above, the Court credits the statements of Russell and York that Jones provided them with drug-laced paperwork. Those pages are also in.

Count 2 charged Parker with sending a drug-laced package to Brandon Jones in December 2017. Parker pleaded guilty to this Count and testified at the evidentiary hearing on Jones' objections that Jones directed her to mail this package. The Court found Parker's testimony on this point credible. Count 2 is relevant conduct for determining Jones' total drug weight.

Two packages had Jones' fingerprints on them. These include a package to Demetri Beachen sent in November 2017 and a package to Jamar Barnes sent in March 2018. Because the evidence shows that Jones handled these packages, they will be considered.

The Court is not convinced as to the remaining packages. The Court has no evidence about who sent the August 2017 package to Tyler Perry and the fictitious sender of that package, Shilts Law Office, is not linked to any other packages attributable to Jones. Similarly, there is no evidence linking Jones to the December 2017 packages sent to Brandon Fluker, Dewand Hardin, and Omarr Sanders.[4] The Court also has no evidence linking Jones to the June 2018 package sent to David Ennik. The Court concedes that all these packages are similar to those sent by Jones. But the Court does not believe that this similarity alone is enough to attribute those packages to Jones as relevant conduct.

**4.**     *Total Drug Weight*

Based on the Court's findings to this point, the total drug weight is:

- November 2017 package to Demetri Beachen: **19.44 grams**
- December 2017 package to Brandon Jones: **32.4 grams**
- January 2018 packages to Jonathan Lynch and Brandon Serna: **120.2 grams**
- January 2018 package to Jonathan Lynch: **111.72 grams**

---

[4] These three packages are noteworthy because the Government knows who sent them, Darnell Bontempo, but the Court learned at the evidentiary hearing on Jones' objections that Bontempo was not interviewed in connection with this investigation.

- March 2018 package to Jamar Barnes: **121.12 grams**

- Russell paperwork: **194.4 grams**

- Synthetic cannabinoid found during the search: **48.173 grams**[5]

- York paperwork: **64.8 grams**

The offense and relevant conduct produce a total drug weight of 712.253 grams of synthetic cannabinoid. Rounded to the nearest kilogram, this represents 119 kilograms of converted drug weight. Under U.S.S.G. § 2D1.1(c)(8), Jones' base offense level remains 24.

**B.**     *Guideline Enhancements*

**1.**     *U.S.S.G. §4A1.1(d)*

Though no longer in effect, before November 2023, U.S.S.G. §4A1.1(d) imposed a two-level enhancement if the instant offense was committed while the defendant was under "any criminal justice sentence." The PSR found that this enhancement applied because Jones was serving a state court sentence until September 2017 and the first packages were sent in August 2017. But since the Court has already concluded that the August 2017 package cannot be connected to Jones by a preponderance of the evidence, it necessarily follows that the two-level enhancement under U.S.S.G. §4A1.1(d) does not apply. Jones' objection to this enhancement is sustained.

**2.**     *U.S.S.G. §2D1.1(b)(1)*

The Guidelines impose a two-level enhancement to controlled substance sentences "if a dangerous weapon (including a firearm) was possessed." "[T]he government bears the burden of proving by a preponderance of the evidence that a firearm was possessed during the commission of the offense or relevant conduct." *United States v. Womack*, 496 F.3d 791, 797 (7th Cir. 2007) (quotation omitted). The government need not prove "a connection between the firearm and the

---

[5] Jones does not object to the inclusion of the synthetic cannabinoid found during the search.

offense, only that the weapon was possessed during the offense." *United States v. Yanez*, 985 F.2d 371, 378 (7th Cir. 1993). If the government carries its burden, then the burden shifts to Jones to demonstrate that it was "clearly improbable" that the firearm was connected to the offense. *Womack*, 496 F.3d at 798.

The testimony and exhibits from the evidentiary hearing show that a Taurus model PT 738 handgun was found in a laundry basket in an upstairs bedroom at the Fourth Street residence. The officer who conducted the search testified on direct that the firearm was found in the same room as a spray bottle filled with synthetic cannabinoid, labels addressed to inmates in prisons across Indiana, latex gloves, digital scales, and Jones' ID. At first blush, this is a textbook case in which the enhancement applies.

Jones points to testimony on cross where the proximity of the firearm to the other incriminating items becomes less clear. Pressed on why a portion of the bedroom was labeled H-2, while the rest of the bedroom was labeled H, Agent Joseph Gass explained:

> I believe they're attached together and, therefore, the way it was set up when the initial walk-through was done, the individuals who labeled each room, labeled it that way to keep it understood there was an H and there was a section of it that they called, almost like a large closet or whatever, they had some furniture in it that they labeled H-2 when they labeled it.

(ECF No. 208 at 49). Jones notes that his ID was found in H-2, while the firearm and other contraband were found in H. He also notes the presence of women's and children's clothes in H-2, alongside men's clothes. Finally, he relies on the testimony of Penny Quinn ("Quinn"), the leaseholder at the Fourth Street residence, who denied that Jones had ever lived at the Fourth Street residence.

First, the Court does not find Quinn's testimony to be credible. The Court had an opportunity to observe Quinn's demeanor while she testified and did not find her to be truthful.

9

Her testimony was contradicted by the presence of Jones' ID at the home and Quinn was unable to account for why Jones' ID would be at the Fourth Street residence. The Court finds, by a preponderance of the evidence, that Jones lived, at least part-time, at the Fourth Street residence.

The Court also discounts the H/H-2 distinction drawn by Jones. The testimony shows that these were not separate rooms, accessible by separate entrances, but a bedroom with a large walk-in closet. It is little surprise to the Court that Jones, and anyone else living in that room, would choose to sleep in the closet instead of the bedroom that contained large amounts of synthetic cannabinoid. The proximity here is enough to show the applicability of §2D1.1(b)(1), and Jones has not shown that it was "clearly improbable" that the firearm related to this offense. *United States v. Rollins*, 544 F.3d 820, 837-38 (7th Cir. 2008). Jones' objection to the firearm enhancement is overruled.

**3.**     *U.S.S.G. §2D1.1(b)(12)*

The guidelines provide for a two-level sentence enhancement "[i]f the defendant maintained a premises for the purpose of manufacturing or distributing a controlled substance." U.S.S.G. §2D1.1(b)(12). This includes "storage of a controlled substance for the purpose of distribution." *Id*. cmt. n.17. The application notes clarify that "[m]anufacturing or distributing a controlled substance need not be the sole purpose for which the premises was maintained, but must be one of the defendant's primary or principal uses for the premises, rather than one of the defendant's incidental or collateral uses for the premises." *Id*.

"[T]o determine whether drug distribution was a primary or incidental use, the district courts are not required to apply a simple balancing test that compares the frequency of unlawful activity at the residence with the frequency of lawful uses." *United States v. Contreras*, 874 F.3d 280, 284 (7th Cir. 2017). That is because "such a test would immunize every family home that is

also used for drug distribution from being deemed an illegally maintained 'premises,'" since "the amount of lawful activity in a home is all but certain to exceed the amount of illegal activity." *Id*. Instead, "the sentencing court should focus on both the frequency and significance of the illicit activities." *Id*.

"Neither a specific frequency nor a particular significance automatically warrants applying the enhancement." *United States v. Sanchez*, 710 F.3d 724, 731 (7th Cir. 2013), *vacated on other grounds*, *Sanchez v. United States*, 571 U.S. 801 (2013). "Rather, we consider the two in tandem and determine whether the prohibited purpose can be fairly described as a 'primary or principal' use of the premises." *Id*. Factors relevant to this analysis include "quantities dealt, customer interactions, keeping 'tools of the trade' and business records, and accepting payment." *Contreras*, 874 F.3d at 284.

Again, Jones argues that there is no evidence connecting him to the Fourth Street residence, relying on Quinn's testimony. Again, the Court rejects that testimony because it finds Quinn to be not credible. Jones "maintained" the Fourth Street residence, at least the H/H-2 room.

Balancing the factors, the Court finds that the Fourth Street residence was primarily or principally used to distribute controlled substances. It had all the tools of the trade: synthetic cannabinoids, paper, envelopes, labels, and scales. There were business records in the form of an apparent drug ledger. And while it's true that there is no evidence of sales at the residence, that's not how this conspiracy worked—drugs were mailed to prisons instead of sold directly to users. The premises enhancement was shown by a preponderance of the evidence and Jones' objection is overruled.

**4.**     *U.S.S.G. §3B1.1*

Finally, Jones objects to the PSR's conclusion that he was an "organizer or leader" of criminal activity, resulting in a four-level enhancement under U.S.S.G. §3B1.1(a). The Government concedes that this was overkill, and instead advocates for a two-level enhancement under subsection (c) of the guideline, describing Jones as an "organizer, leader, manager, or supervisor" in a scheme involving fewer than five participants. Given the Government's concession, the Court will start from the two-level enhancement.

Under § 3B1.1(c), a manager or supervisor is one who, "[e]xercise[s] control and authority over another," such as "[w]hen he 'tells people what to do and determines whether they've done it.'" *See United States v. Dade*, 787 F.3d 1165, 1167 (7th Cir. 2015). The evidentiary hearing more than established Jones' leadership role. Parker testified that Jones provided her with drug-laced paperwork, told her to print out labels with addresses in Indiana prisons and return addresses with Fort Wayne law firms and government agencies, taught her how to make drug-laced paperwork, and paid her for her efforts. Jones told Parker what to do, determined whether she had done it, and paid her when the criminal activity concluded. This is enough.

Jones challenges the veracity of Parker's testimony, and the Court agrees that she was far from a model witness. But the Court finds that her admissions to criminal wrongdoing, and her testimony implicating Jones in that wrongdoing, were credible. If anything, she seemed reluctant to admit to conduct and to tie Jones to that conduct. If she was less-than-honest, then, it was for Jones' benefit. The two-level enhancement under §3B1.1(c) is appropriate.

**III.     Conclusion**

For these reasons, Jones' objections to the PSR are SUSTAINED in part and OVERRULED in part. The Court finds that Jones' base offense level, taken from the total drug

weight, is 24. Jones' objection to the two-level enhancement under §4A1.1(d) is SUSTAINED. His objections to the two-level enhancements under §2D1.1(b)(1) and (12) are OVERRULED. Jones' objection to the four-level enhancement under §3B1.1(a) is SUSTAINED, but the Court concludes that a two-level enhancement under (c) is appropriate. The probation officer is DIRECTED to prepare an amended PSR to reflect this opinion and order. Sentencing will be set by separate order.

      SO ORDERED on December 13, 2023.

                                s/ *Holly A. Brady*
                                CHIEF JUDGE HOLLY A. BRADY
                                UNITED STATES DISTRICT COURT